Kathy BRIGHT and Susan Barber,
Plaintiffs-Appellants,

v.

BALL MEMORIAL HOSPITAL ASSOCI-
ATION, INC., Defendant-Appellee.

No. 79–1134.

United States Court of Appeals,
Seventh Circuit.

Argued June 14, 1979.

Decided Feb. 21, 1980.

Kenneth J. Falk, Legal Services Organization, Muncie, Ind., for plaintiffs-appellants.

Jon H. Moll, Muncie, Ind., for defendant-appellee.

Before TONE and BAUER, Circuit Judges, and WILL, Senior District Judge.*

WILL, Senior District Judge.

Appellants Kathy Bright and Susan Barber seek reversal of the district court's determination that appellee Ball Memorial Hospital Association, Inc. ("Ball Memorial" or "Hospital") was not a "creditor" within the meaning of the Truth in Lending Act ("Act"), 15 U.S.C. §§ 1601, et seq., and seek a further determination that Ball Memorial violated the provisions of the Act as to them. For the reasons stated, we affirm the district court's judgment on grounds other than those relied upon by the district court.

## BACKGROUND

Ball Memorial is a not-for-profit hospital incorporated under the laws of the State of Indiana. Located in Delaware County, Indiana, Ball Memorial serves its own and four surrounding counties and operates as the primary referral hospital for East Central Indiana. It is a general public hospital, admitting all persons without regard to ability to pay.

Upon admission to the hospital, inpatients are shown and asked to sign an "Initial Credit Disclosure Statement and Consent to Treatment" form. The Initial Credit Disclosure Statement initially states: "You are requested to remit the balance due on your account with the hospital at the time of discharge." This Statement further sets forth, however, conditions under which an inpatient may pay the account balance in installments "IF IT IS NECESSARY" for the patient to use such a procedure. The conditions include the imposition of a "FINANCE CHARGE of ¾% per month on any unpaid balance, unpaid for more than thirty (30) days." Similarly, one of the pamphlets contained in the "Hospital Patient Guide" given to each inpatient informs the patient that the account is "payable at the time of your discharge," but also informs the patient that, if unable to pay the entire bill,

> you or your relative must be prepared to talk with the credit manager . . . to make satisfactory credit arrangements. Our credit department will discuss with you financial arrangements and will set up the payment of your account according to your ability to pay.

This pamphlet also makes "FINANCIAL DISCLOSURE" of a "FINANCE CHARGE" which "will be added to all uncollected or past due accounts."

Pursuant to these written directives and additional oral instructions, Ball Memorial will make arrangements, prior to discharge, with inpatients without insurance or other third-party coverage who are unable to pay the bill in full upon discharge such that an installment payment schedule is established. These schedules sometimes call for payment in more than four installments. Regardless of whether the agreements contemplate more than four installments, a ¾% monthly charge is assessed on the outstanding account balance each month while the installments are paid. Patients making these arrangements subsequently receive from the Hospital an initial bill and a coupon book embodying the installment plan arranged, and subsequently receive monthly statements of their balances as the installments are paid. They do not receive the billing statements which are described in Ball Memorial's general billing cycle, *infra.*

* The Honorable Hubert L. Will, Senior District Judge of the Northern District of Illinois, is sitting by designation.

Inpatients not making such installment payment arrangements at the time of discharge receive an initial bill from Ball Memorial on the fourth day after discharge which delineates the specific charges assessed to their accounts. On the reverse side of this initial bill is a schedule of information headed *"FINANCE CHARGE,"* which advises the patient that a "FINANCE CHARGE" of ¾% per month or a 50¢ "HANDLING CHARGE," whichever is greater, will be added to any unpaid balance of 30 days or more, but that no such charge would be imposed if the bill were paid in full within 30 days. The schedule concludes by stating that "All charges are in compliance with the Truth and [sic] Lending Act and Uniform Consumer Credit Code."

If an inpatient has not made payment arrangements with the Hospital, on the eighteenth day after discharge the patient is mailed the first billing statement which indicates the total amount due. On its face, the statement states: "Your account is now due and payable. Please remit today." This statement, as do all subsequent statements, also bears the language: "Payment is due in full when service is rendered." On its reverse side, the statement contains a schedule of information headed "FINANCE CHARGE" which is identical to the schedule of information contained on the reverse side of the initial bill, except for the addition of the following:

9) The chart below demonstrates the minimum monthly payment required under Ball Memorial Hospital's credit policy.

| IF YOUR ORIGINAL BALANCE IS | 10–200 | 201–300 | 301–400 | 401–500 | 501–600 | 601–700 | 701–800 | OVER 800 |
|---|---|---|---|---|---|---|---|---|
| YOUR MINIMUM MONTHLY PMT IS | 10 | 15 | 20 | 25 | 30 | 35 | 40 | 5% |

10) You may pay a larger part or all of the balance of your account at any time.

Where no payment arrangements have been made, on the forty-eighth day after discharge the patient is mailed a second billing statement identical to the first in all respects except that the face now bears the language: "No doubt you have overlooked payment of your account, please make your remittance now." It is at the forty-eighth day that Ball Memorial considers an account to be delinquent. If payment in full is received before this time, the monthly charge which would have been assessed on the first month is waived. At this point, the monthly charge of ¾% of the unpaid balance or 50¢ is first assessed.

If no payment arrangements are made, Ball Memorial mails a third statement on the sixty-second day after discharge. This statement is identical to the first two, except it bears the language: "We are surprised that you continue to ignore your past due account. We must insist on immediate payment." Along with this statement, inpatients automatically receive a coupon book, dividing the patient's obligation into monthly installment payments along lines consistent with the table set forth above. If at this point the patient begins making payments pursuant to the coupon book, the patient does not receive the fourth or fifth statements discussed below. Rather, the patient will receive a monthly statement showing the payments received, the monthly charges imposed, and the balance due. These bills are on forms identical to those used for inpatients who arranged installment payment schedules prior to their discharge from the Hospital, and continue until the bill is paid in full.

On the seventy-sixth day after discharge, a patient who has not arranged to pay his bill or begun making installment payments is mailed the fourth statement. This state-

ment is identical to the first three, except it now bears the language: "It is apparent that you have ignored all our previous notices. If there is any reason for delay of your payment contact this office now." A fifth and final statement is mailed on the ninetieth day after discharge. This statement is identical to the first four, except it is stamped "Final Notice" in red, and contains the legend: "Final Notice. Unless this account is paid in full by _____ it will be turned over to an outside collection agency." ·

In addition to these written statements, Ball Memorial attempts to make contact with patients by telephone during the same time period in an effort to secure payment. The Hospital's decision finally to turn inpatient accounts over to an outside collection agency is apparently made on a case-by-case basis after the fifth and final statement is sent. Accounts are not assigned out for collection where patients are making installment payments.

Ball Memorial's billing procedures with respect to outpatients are similar to those used for inpatients, but differ in several respects. Outpatients apparently receive neither the Initial Credit Disclosure Statement nor the Hospital Patient Guide at the time of service. The Hospital generally treats these patients on a cash basis, and only in rare circumstances where the outpatient's bill is large will it initially attempt to arrange an installment payment plan. The initial bill received by outpatients on the fourth day after discharge is not identical to that received by inpatients. Rather, an outpatient's initial bill is mailed on the statement form used generally by Ball Memorial. Outpatients subsequently receive the same series of first through fifth statements, except that the periodic charge disclosed on the reverse side of the statement form is labeled a "HANDLING CHARGE." Coupon books are not mailed to outpatients routinely with the third statement, but are apparently sent only to those whose bill exceeds $40. Outpatient accounts are automatically turned over to a collection agency fourteen days after the fifth statement is sent.

Appellant Bright was an inpatient at Ball Memorial July 6–10, 1977. While in the Hospital, Bright was apparently shown a copy of the Initial Credit Disclosure Statement, but did not sign it. Presumably, she was also given a copy of the Hospital Patient Guide. At the time of her discharge, she made no arrangements with the Hospital to repay her bill. Bright subsequently received her initial bill, and the first, second, and third statements from the Hospital. She also received a coupon book with the third statement, containing more than four coupons.

Bright never utilized the coupon book to make a payment to the Hospital. Yet, even after the bill remained unpaid for more than 104 days, Bright's debt was not referred to an outside collection agency because she and the Hospital were working together to secure payment of the obligation. When efforts to secure public financial assistance for Bright were unsuccessful, Bright and Ball Memorial, on November 1, 1977, orally agreed to a payment plan whereby Bright would repay her bill in $15 monthly installments. Several days later, Bright and Ball Memorial orally modified the agreement to payments of $20 per month. Bright made no payments pursuant to either of these agreements. On March 1, 1978, Bright paid $30 to the Hospital, which was credited to her July 10, 1977 account and a previous account owing to the Hospital. Further contacts and negotiations followed, and on March 23, 1978, Ball Memorial and Bright agreed that her entire obligation (originally $933.35) would be satisfied if Bright would pay $15 per month for 24 months. Since March 23, 1978, Bright has made no payments to Ball Memorial.

Appellant Barber received outpatient care at Ball Memorial on numerous occasions, some of which entailed the provision of services charged at more than $40. Presumably, she received an initial bill and the first through fifth statements from the Hospital with respect to each outpatient visit. Along with the third statements she has received, Barber received at least one

coupon book containing more than four coupons and presumably has received others for those bills which exceeded $40. Barber has never reached any agreement with the Hospital on repayment nor has she paid anything for any of the services. Handling charges were added to her accounts and her accounts were turned over to a collection agency.

Appellants filed suit as a class action against the Hospital, alleging that its billing and credit procedures were in violation of the Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.* Before reaching the issue of class certification, the district court granted Ball Memorial's motion to dismiss for lack of subject matter jurisdiction. Treating the motion to dismiss as one for summary judgment, the district court apparently held that Ball Memorial was not a "creditor" within the meaning of 15 U.S.C. § 1602(f) under any circumstances involving its billing practices. Specifically, the district court found that Ball Memorial neither extended "credit" "in the ordinary course of business" nor imposed a "finance charge" within the meaning of the Act, and that the purposes of the Act would not be served by extending its coverage to "institutions such as Ball Memorial."

Without approving the broad ruling of the district court that Ball Memorial is not a "creditor" under the Act, we affirm that court's judgment on the ground that Ball Memorial did not consummate credit transactions with either Bright or Barber.

## CONSUMMATION OF CREDIT TRANSACTIONS WITH APPELLANTS

■ Regulation Z, 12 C.F.R. § 226.8(a) provides that all disclosures required of a "creditor" by the Act must be made prior to the time that the "transaction is consummated." Regulation Z, 12 C.F.R. § 226.-2(kk) further specifies that:

A transaction shall be considered consummated at the time a contractual relationship is created between a creditor and a customer or a lessor and lessee irrespective of the time of performance of either party.

In regard to a factual situation involving a hospital similar to this case, the Federal Reserve Board staff has stated:

If services are performed for patients under the general assumption that the bill will be paid upon discharge and if subsequently it is necessary for the hospital to finance that bill, the "transaction" for purposes of Section 226.8 is the credit transaction and not the physical act of performing the hospital services. Accordingly, in meeting the requirements of Section 226.8(a) that disclosures must be made "before the transaction is consummated" the hospital need only make disclosures prior to consummation of the financing arrangements.

Federal Reserve Board (FRB) Unofficial Staff Interpretation No. 170 (October 24, 1969), Cons.Cred.Guide (CCH) ¶ 30,498.[1] For appellants to be able to claim that the Hospital violated the Truth in Lending Act as to them, they must have consummated credit transactions with the Hospital.

■ Appellant Bright argues that credit transactions between Ball Memorial and her were consummated on a number of occasions. First, Bright apparently contends that her payment of $30 to Ball Memorial on March 1, 1978 evidences her acceptance of installment payment terms offered by the Hospital. The facts do not support this contention. Bright's $30 payment some four months after she had reached the $15 per month and $20 per month work-out agreements with the Hospital in November 1977 was clearly not responsive to either of those work-out agreements nor to the terms of the coupon book which Bright had even earlier received along with the third statement from the Hospital. Under these cir-

---

1.  While the Federal Reserve Board interpretive regulations and staff opinion letters are not binding upon the courts, these constructions of the statute and the Board regulations are entitled to substantial deference "because of the important interpretive powers granted to the agency in this very complex field." *Croysdale v. Franklin Savings Association*, 601 F.2d 1340, 1344 n.4 (7th Cir. 1979). *See also Smith v. No. 2 Galesburg Crown Finance Corp.*, Nos. 78–2155, *et al.*, 615 F.2d 407 at 417–418 (7th Cir. 1980).

cumstances, Bright's March 1 payment was merely a one-time partial payment of her account, the acceptance of which by the Hospital does not constitute an agreement to a credit transaction. See, e. g., FRB Unofficial Staff Interpretation No. 170, supra.

Second, Bright contends that the two agreements which she reached with the Hospital in early November 1977, $15 and $20 per month respectively, satisfy the "consummation" requirement. As an initial matter, there is no indication in the record whether, in either of these agreements with the Hospital, the agreement embodied a commitment by Bright to pay the Hospital the ¾% monthly charges on the outstanding balance in addition to repayment of the original balance of over $900.[2] We do not, however, find that either agreement was one involving the extension of "credit" so as to require disclosures under the Act.

The Federal Reserve Board staff has consistently indicated that "informal workout arrangements" reached between a vendor and a customer do not require disclosures under the Act even though the workout involves more than four installments or payment in full of the underlying obligation. In FRB Official Staff Interpretation FC–0101 (July 19, 1977), Cons.Cred.Guide (CCH) ¶ 31,637, the Federal Reserve Board staff reviewed a bank's plan which allowed its delinquent customers to repay their debts on terms different from those originally agreed upon. Specifically, the bank established a "deficiency balance" in each delinquent account and then made contact by telephone with the debtor, giving the debtor an opportunity to pay the deficiency balance in full or in installments.

If the debtor elected to pay in installments, a monthly payment commensurate with the debtor's ability to pay was established and the customer was mailed a form letter and coupon book reflecting the agreement. The staff concluded:

your bank's plan, as outlined above, is an informal workout arrangement requiring no new Truth in Lending disclosures. In staff's view, a formal written workout arrangement would involve some new evidence of indebtedness executed by the customer, such as a new note, contract or other form of written agreement. We do not believe that a unilateral written communication by either the creditor or the customer (such as a letter confirming matters previously discussed either orally or in writing) renders a workout arrangement formal and subject to the disclosure requirements of Regulation Z even though the plan might, like yours, involve repayment in more than four installments on terms differing from the original installment credit transaction.

Similarly, in FRB Unofficial Staff Interpretation No. 1230 (August 9, 1977), Cons.Cred. Guide (CCH) ¶ 31,669, the staff stated that where a bank offered its delinquent customer the opportunity to pay the obligation in monthly installments smaller than the agreements previously agreed upon, and the customer then wrote or telephoned to agree to these or other monthly payment arrangements, it would not regard the situation as a "formal written prejudgment workout agreement" because no new evidence of indebtedness was executed. The distinctions drawn between informal and formal workout agreements clearly apply to entities other than banks. See FRB Unofficial Staff Interpretation No. 1221 (July 19, 1977), Cons.Cred.Guide (CCH) ¶ 31,660.

Bright's early November 1977 oral agreements with Ball Memorial were reached more than 110 days after Bright's discharge as an inpatient on July 10, 1977. Given the computerized billing system utilized by the Hospital, by November 1, Bright had been mailed all five statements sent during the Hospital's billing cycle, including the coupon book sent along with the third statement. At this point on the billing cycle, the usual next step taken by the Hospital was

---

2. Even if these agreements did not involve an agreement to pay a monthly ¾% finance charge, they could still be a "credit" agreement requiring disclosures since payment was to be

in more than four installments. See, e. g., Manzina v. Publishers Guild, Inc., 386 F.Supp. 241, 244 (S.D,N.Y.1974).

to refer the account to a collection agency. At no time prior to November 1 did Bright ever make any explicit agreement with the Hospital to pay her bill nor did she take any action, such as making a partial payment, indicating implicit acceptance of the Hospital's installment payment option.

■ Given these circumstances, it is clear that the Hospital regarded Bright's account as delinquent and was seeking at the time of these notices and discussions to make some arrangement short of referring Bright's account to a collection agency. The terms of the agreements reached between Bright and the Hospital were substantially different from the terms for installment payments set forth generally on the billing statements previously sent by the Hospital. These statements indicate that for a bill the size of Bright's ($933.35), the minimum monthly payment was 5% of the outstanding balance: Bright's agreements were for the substantially smaller sums of $15 and $20 per month. Moreover, these agreements were reached without a new written evidence of Bright's indebtedness in a manner consistent with the Federal Reserve Board interpretations. Bright's November 1977 agreements were thus "informal workout agreements" not requiring the disclosures provided by the Act *even though* these agreements contemplated payment in more than four installments and may have entailed payment of monthly ¾% charges on the outstanding balance.[3]

Finally, Bright and Barber contend that consummation occurred when they, having failed to make any payments on their accounts, had monthly charges assessed against them beginning on the forty-eighth day after discharge. Specifically, appellants argue that, since the Hospital's self-described "finance charges" were in fact levied against their accounts and since the Hospital, when it seeks judgments in cases filed to collect the accounts, includes the "finance charges," the Hospital itself considers them to have agreed to the charges. Appellants further contend that the charges assessed were "finance charges" within the meaning of the Act.

■ Ball Memorial conceded at oral argument that it assessed these charges on appellants' accounts (and others like them), but did so on the basis that these charges were "late payment" charges, and not "finance charges." Regulation Z, 12 C.F.R. § 226.4(c). The question before us is thus whether the charges assessed by the Hospital against Bright and Barber's accounts subsequent to the forty-eighth day after discharge were bona fide charges made for late payment or were "finance charges," such that Ball Memorial consummated a credit transaction with them. We conclude that these charges were "late payment" charges.

15 U.S.C. § 1602(f) defines a "creditor" as:

> The term "creditor" refers only to creditors who regularly extend, or arrange for the extension of, credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, whether in connection with loans, sales of property or services, or otherwise.[4]

15 U.S.C. § 1602(e) provides the following definition of "credit":

---

3. Our holding with respect to the November 1977 agreements applies with equal force to Bright's contention that "consummation" of a credit transaction occurred when she agreed with the Hospital on March 23, 1978 to satisfy her entire obligation by making monthly payments of $15 for 24 months. This agreement, also entered without a new written evidence of Bright's indebtedness and at a time when the Hospital clearly regarded Bright's account as in default, is a classic example of an "informal workout arrangement" not within the coverage of the Act.

4. Regulation Z, 12 C.F.R. § 226.2(s) provides a similar, though slightly expanded, definition:

> "Creditor" means a person who in the ordinary course of business regularly extends or arranges for the extension of consumer credit, or offers to extend or arrange for the extension of such credit, which is payable by agreement in more than four installments, or for which the payment of a finance charge is or may be required, whether in connection with loans, sales of property or services, or otherwise.

The term "credit" means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.[5]

In light of these statutory definitions, it is clear that the district court erroneously held that Ball Memorial was not a "creditor" with respect to any of its patients.

While the Hospital clearly desires and encourages its patients to pay their bills in full at the time of discharge, the Hospital also deliberately established for inpatients the option of electing before discharge to arrange to pay their bills in installments. Inpatients are routinely informed of this option through the Initial Credit Disclosure Statement and a pamphlet in the Hospital Patient Guide. Inpatients, as well as presumably outpatients with large bills, are also informed orally of their responsibility to make arrangements for periodic payment if they are unable currently to pay in full.

Given the size of the Hospital's bills, there is no doubt that some patients are offered installment plans payable in more than four installments. Similarly, the terms of the installment payment plans offered to these patients contain the ¾% monthly charge on the outstanding balance. In light of this record, Ball Memorial clearly "in the ordinary course of business regularly" both (1) extends credit which is payable in more than four installments and (2) extends credit for which the payment of a finance charge is required.

In addition to thus being a "creditor" within the statutory definition of 15 U.S.C. § 1602(f),[6] Ball Memorial clearly consummates credit transactions with those patients who, prior to their discharge from the Hospital, reach agreements with the Hospital to pay their bills in more than four installments or on terms under which the ¾% monthly charge is assessed. The fact, however, that Ball Memorial has consummated credit transactions with some of its patients or that Ball Memorial may have extended "credit" to these appellants prior to its imposition of the charges to their accounts on the forty-eighth day does not require the conclusion that the Hospital's imposition of these monthly charges consummated a credit transaction with them.

Regulation Z, 12 C.F.R. § 226.4(c) distinguishes between "late payment" and "finance" charges:

A late payment, delinquency, default, reinstatement, or other such charge is not a finance charge if imposed for actual unanticipated late payment, delinquency, default, or other such occurrence.

Appellants argue initially that the monthly charges imposed on their accounts were

---

5. Regulation Z, 12 C.F.R. § 226.2(q) defines "credit" as:

the right granted by a creditor to a customer to defer payment of debt, incur debt and defer its payment, or purchase property or services and defer payment therefor.

6. The district court apparently concluded that Ball Memorial did not extend "credit" "in the ordinary course of business" because the Hospital's general policy considers accounts due at the time services are rendered and because Ball Memorial only allowed installment payments "because of necessity." Additionally, the court reasoned that the Act did not apply because Ball Memorial is a not-for-profit hospital having "no incentive to extend credit other than to encourage payment of debts already due."

Without questioning Ball Memorial's motivation in making installment payment options available to its patients, we do not find the district court's analysis of incentive or motivation relevant to the question of whether Ball Memorial is a "creditor" under the Act. While the Act was clearly intended to protect the consumer against unscrupulous credit practices and providers of credit, the Act was equally designed to promote generally the consumers' informed use of credit. See 15 U.S.C. § 1601(a).

Ball Memorial's patients have a need equal to that of consumers generally to make an informed choice between repaying their account in full immediately, whether through personal savings or other sources of funds, or repaying in installments pursuant to the Hospital's plan. Neither the Act, see 15 U.S.C. § 1603, nor the interpretive letters issued by the Federal Reserve Board, see FRB Unofficial Staff Interpretation (June 6, 1969), Cons.Cred.Guide (CCH) ¶ 30,033; FRB Unofficial Staff Interpretation (May 7, 1969), Cons.Cred.Guide (CCH) ¶ 30,027, have recognized a blanket exemption from the Act for not-for-profit hospitals. We find no such per se exemption warranted.

"anticipated" within the meaning of § 226.-4(c) because the Hospital obtained approximately $78,000 in revenue from such charges during the period from July 1, 1977 through September 1978,[7] and because it budgets for this revenue in the annual budget. This argument, however, misconstrues the meaning of "unanticipated" in § 226.4(c). The fact that a business may expect to have delinquent accounts and anticipate the possible receipt of some revenues from the charges imposed on such accounts does not automatically render such charges "finance charges." Rather, "unanticipated" within § 226.4(c) means that the failure of any customer to pay his bill on time is not anticipated in any particular case. *See* FRB Unofficial Staff Interpretation No. 1301 (May 23, 1978), Cons.Cred. Guide (CCH) ¶ 31,792.

■ In an effort to clarify the difference between a "late payment charge" and a "finance charge," the Federal Reserve Board has issued an interpretive rule. 12 C.F.R. § 226.401. In this rule, which has been held valid, *Kroll v. Cities Service Oil Co.,* 352 F.Supp. 357, 363 (N.D.Ill.1972), the Board considered a vendor which billed its customers so that the full bill was due within a stipulated period after billing, with no installment payment option. If the bill was not paid in full by the end of the period, the vendor imposed a periodic charge on the unpaid balance until fully paid. The Board stated:

When in the ordinary course of business a vendor's billings are not paid in full within that stipulated period of time, and under such circumstances the vendor does not, in fact, regard such accounts in default, but continues or will continue to extend credit and imposes charges periodically for delaying payment of such accounts from time to time until paid, the charge so imposed comes within the definition of a "finance charge" . . ..

This rule indicates that whether a charge ostensibly imposed for late payment is a "finance charge" depends on whether the vendor regards accounts not paid within the required period to be in default and whether the vendor continues to extend credit to the customer in default. *See Continental Oil Co. v. Burns,* 317 F.Supp. 194, 196 (D.Del.1970).

Whether or not the vendor considers its customers' accounts delinquent must be judged by its actions taken as a whole. *See* FRB Official Staff Interpretation FC–0060 (April 4, 1977), Cons.Cred.Guide (CCH) ¶ 31,570; FRB Unofficial Staff Interpretation No. 1171 (March 31, 1977), Cons.Cred. Guide (CCH) ¶ 31,568; FRB Unofficial Staff Interpretation (July 9, 1969), Cons. Cred.Guide (CCH) ¶ 30,088. Particularly relevant is whether the vendor continues to extend credit to its customers after the time of default, though the continued extension of credit under exigent circumstances should not defeat a finding that the charges are in fact "late payment" charges. *See* FRB Unofficial Staff Interpretation No. 912 (August 13, 1975), Cons.Cred.Guide (CCH) ¶ 31,246 (hospital furnishing services to delinquent patients only where "certified medical necessity" exists); FRB Unofficial Staff Interpretation (July 9, 1969), *supra* (occasional extension by hospital of credit to delinquent patients in emergency situations).

Also particularly relevant is whether the vendor takes "commercially reasonable" efforts to correct the delinquency situation both through clear notification to its customer that the customer is delinquent, *see* FRB Unofficial Staff Interpretation No. 797 (May 16, 1974), Cons.Cred.Guide (CCH) ¶ 31,119; FRB Unofficial Staff Interpretation No. 414 (October 23, 1970), Cons.Cred. Guide (CCH) ¶ 30,600, and through efforts

---

**7.** The $78,000 which the Hospital obtained from its "finance charges" apparently includes all charges gathered from both patients who, unlike appellants, prior to default arranged installment plans with periodic payments and patients who, like appellants, have charges imposed on their accounts where they have neither agreed to pay their bills nor commenced to pay their bills in installments. There is no calculation in the record of the amount derived by the Hospital from its assessment of charges against patients in the latter category. This amount is undoubtedly small.

to collect the delinquent account. *See, e. g.,* FRB Official Staff Interpretation FC–0060, *supra;* FRB Unofficial Staff Interpretation No. 1171, *supra.*

Applying these general principles to the facts of this case, we conclude that the ¾% monthly charge imposed upon Bright's inpatient bill and the 50¢ handling charge imposed upon Barber's outpatient bills commencing with the forty-eighth day after discharge were bona fide late payment charges. Most importantly, Ball Memorial considers its patient accounts not paid within the forty-eight day period to be delinquent and takes "commercially reasonable" efforts to collect those accounts once they are determined to be delinquent. Subsequent to the forty-eighth·day, Ball Memorial sends statements on the sixty-second, seventy-sixth and ninetieth days—each clearly advising the patient that the account is considered overdue and insisting upon payment. Ball Memorial additionally attempts to make contact by telephone with its patients during this period in an effort to collect on the accounts. Accounts on which no payment agreement is reached and where no payments have been made are generally referred to an outside collection agency less than two months after the Hospital considers them delinquent.

Appellants argue particularly that the facts that (1) Ball Memorial mails the coupon book with the third statement, and does not continue to send dunning notices to or refer to a collection agency those patients who begin to pay through the coupon book and (2) Ball Memorial does not refer its accounts to a collection agency until after the 104th billing day demonstrates that the Hospital does not treat these accounts as delinquent. We disagree.

That Ball Memorial does not immediately refer its delinquent accounts to a collection agency hardly indicates commercially unreasonable efforts to collect these accounts. *See Vega v. First Federal Savings & Loan Association of Detroit,* 433 F.Supp. 624, 628 (E.D.Mich.1977). *See also* FRB Unofficial Staff Interpretation No. 1301, *supra.* Rather, the Hospital's combined use of telephon-ic and mail communications over the less than two months following the forty-eighth day prior to its referral to a collection agency appears well designed to attempt a repayment of the debt. This practice is hardly designed to amass large monthly charges while the account lies dormant and unpaid.

Nor does Ball Memorial's mailing of the coupon book with the third statement, nor its failure to send dunning notices to those patients who commence installment payments pursuant to the coupon book, indicate that the charges assessed to these appellants' accounts are "finance charges." We need not decide on this appeal whether patients who commence ·installment payments based on the coupon book consummate "credit" transactions with the Hospital since neither appellant did so. Insofar as appellants' accounts are concerned, the generalized mailing of such coupon books to delinquent inpatients and outpatients with balances over $40 indicates nothing more than a sincere effort on the Hospital's part to seek some repayment. The Hospital's practice not to mail dunning statements to or to assign the accounts of those delinquent patients who have commenced installment payments merely demonstrates the Hospital's good common sense.

Finally, appellants argue that the Hospital's use of the label "finance charge" on its printed materials indicates that the charges are, in fact, "finance charges" under the Act. While we agree with appellants that this terminology is relevant to our determination, *see* FRB Unofficial Staff Interpretation No. 1172, *supra,* it is by no means determinative. *See* FRB Unofficial Staff Interpretation No. 414, *supra.* In this regard, we agree with the district court that "the substance of the billing system controls, not its labels." We conclude, therefore, that the monthly charges assessed against Bright's and Barber's accounts were bona fide "late payment" charges under Regulation Z, 12 C.F.R. § 226.4(c).

Since the charges assessed against appellants' accounts were bona fide "late payment" charges, their imposition did not constitute the consummation of a credit trans-

action by the Hospital with either appellant. Thus, even though the Hospital may have been a potential "creditor" under the Act in its offering the extension of credit to the appellants, the disclosure obligations imposed by the Act did not arise as to them. Regulation Z, 12 C.F.R. § 226.8(a).

Accordingly, we need not address the question of whether Ball Memorial's credit and billing procedures violated the Act, and we affirm the judgment of the district court on the grounds stated.