No. 91-388

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

CESSNA FINANCE CORPORATION,

Plaintiff and Respondent,

v.

ROBERT E. CHAMBERS; JOHN S. PARKER,

Defendants and Appellants.

FILED

MAR 31 1992

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Thomas M. McKittrick, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

Robert J. Emmons, Emmons & Sullivan,
Great Falls, Montana

For Respondent:

G. Curtis Drake, Keller, Reynolds, Drake,
Sternhagen & Johnson, Helena, Montana


Submitted on Briefs: January 16, 1992

Decided: March 31, 1992

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

On September 16, 1982, Cessna Finance Corporation filed a complaint against Robert E. Chambers and John S. Parker in the Eighth Judicial District Court in Cascade County. In this complaint, Cessna sought a deficiency judgment following the sale of an airplane it had repossessed from Chambers and Parker. Cessna obtained a default judgment against Parker, but Chambers contested the action. On May 21, 1991, the District Court entered Findings of Fact, Conclusions of Law, and a Judgment in which it found Chambers liable for the deficiency. The court denied a subsequent motion by Chambers to amend the Findings, Conclusions, and Judgment. Chambers appeals. We affirm.

The issues are:

1. Did the District Court err when it concluded that the contract authorized a late-payment penalty in the amount of 12 percent of the outstanding balance?

2. Did the District Court err when it found that Cessna's denomination of late-payment penalties as "finance charges" did not violate the Montana Retail Installment Sales Act?

On August 10, 1978, Chambers and Parker bought a Cessna 206 airplane from Skymart Aviation in Great Falls. They financed this purchase by entering into an installment contract with Skymart, which subsequently assigned the contract to Cessna Finance Corporation, an entity that assists buyers in financing purchases of airplanes manufactured by the Cessna Aircraft Company. After

2

the downpayment, $62,250 remained to be paid in six annual installments. The agreement between Cessna, Chambers, and Parker called for an "annual percentage rate" of 12 percent.

Before long, a dispute arose between Chambers and Parker regarding the use of the airplane. They agreed that Parker would assume the sole obligation to make payments in exchange for sole use of the airplane. Cessna, however, did not release Chambers from his liability on the purchase contract. Parker actually made the 1979 and 1980 payments, but defaulted on the 1981 payment. Neither Parker nor Chambers made any payments on the airplane after 1980.

Cessna then accelerated the remaining balance, repossessed the airplane, and sold it to a third party. At the time Cessna repossessed the airplane, $53,060.59 remained outstanding on the purchase contract itself. To this amount, Cessna added $152.88 for storage, $44.00 for storage insurance, and $2,452.12 in repossession expenses. The sale yielded $35,501.00, which left a deficiency of $20,208.60.

Cessna obtained a default judgment against Parker and proceeded against Chambers alone for the deficiency. Chambers raised the affirmative defenses of failure to pursue a guarantor and failure to mitigate damages. The court, sitting without a jury, conducted a trial of the matter on January 3, 1990. Subsequently, the court issued its Findings of Fact, Conclusions of

3

Law, and Judgment in which it found Chambers liable for the deficiency and rejected his affirmative defenses.

On June 7, 1991, Chambers moved to amend the Findings, Conclusions, and Judgment. Chambers argued that the purchase contract violated the Montana Retail Installment Sales Act by denominating late-payment penalties as "finance charges" rather than "interest." The court denied this motion on July 10, 1991. Chambers appeals.

I

Did the District Court err when it concluded that the contract authorized a late-payment penalty in the amount of 12 percent of the outstanding balance?

The relevant contract provisions read as follows:

*6.  CREDIT SERVICE CHARGE, FINANCE
     CHARGE, TIME PRICE DIFFERENTIAL              $28,594.80

     ANNUAL PERCENTAGE RATE __12.__%
     . . . .

     Buyer and Seller further agree that (i) should Buyer
make any payment after its due date the FINANCE CHARGE
(CREDIT SERVICE CHARGE, TIME PRICE DIFFERENTIAL) will be
increased proportionately since the FINANCE CHARGE
(CREDIT SERVICE CHARGE, TIME PRICE DIFFERENTIAL) is
computed on a daily basis . . . .

     . . . .

DEFAULT CHARGES--Seller has the option to declare the
unpaid balance of the PRINCIPAL (UNPAID BALANCE, BASE
TIME PRICE) to be immediately due if Buyer defaults in
making payments according to the above PAYMENT SCHEDULE
or otherwise defaults. . . . If any payment is not made
by the due date the unpaid PRINCIPAL (UNPAID BALANCE
BASE, TIME PRICE) shall continue to accrue FINANCE CHARGE

4

(CREDIT SERVICE CHARGE, TIME PRICE DIFFERENTIAL) at the above ANNUAL PERCENTAGE RATE.

. . . .

*The amounts shown above in Item 6 (FINANCE CHARGE, CREDIT SERVICE CHARGE, TIME PRICE DIFFERENTIAL) . . . are estimates as authorized by Regulation Z §226.6(f) computed on the assumption that all installment payments will be made on the scheduled dates. As the FINANCE CHARGE (CREDIT SERVICE CHARGE, TIME PRICE DIFFERENTIAL) . . . is computed on a daily basis, if Buyer fails to make any installment payment on or before the due date, Buyer will be obligated to pay additional amounts by reason of the FINANCE CHARGE (CREDIT SERVICE CHARGE, TIME PRICE DIFFERENTIAL) . . . .

Chambers argues that Cessna cannot collect interest on the judgment because the contract provisions quoted above do not use the word "interest." He asserts that "finance charges" are calculated differently than "interest" and that, therefore, when he agreed to pay a "finance charge" he did not necessarily agree to pay "interest." We reject this argument because we conclude that Chambers did in fact agree to a late-payment penalty expressed as a percentage of the outstanding principal.

The contract's discussion of the "finance charge" refers to Regulation Z, which was promulgated by the Federal Reserve Board under the authority of the Federal Truth in Lending Act, 15 U.S.C. § 1601-1667(e). It is clear that the Truth in Lending Act and Regulation Z do not control or preempt state law in regard to this $62,250 transaction because they do not apply to transactions that exceed $25,000. 15 U.S.C. § 1603; 12 C.F.R. § 226.3(b). However, in light of the contract's reference to Regulation Z in its

5

discussion of the "finance charge," we turn to that regulation for assistance in defining terms.

A "finance charge" is the expression of the cost of the credit as a dollar amount. It includes, but is not limited to, interest. 15 U.S.C. § 1604; 12 C.F.R. § 226.4(a).

An "annual percentage rate" is "a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made." 12 C.F.R. § 226.22(a)(1).

The contract addresses the problem of late payments by providing that in the event of default the "finance charge" continues to accrue at the "annual percentage rate." It is significant that the contract refers to the "annual percentage rate" in this manner. Under Regulation Z, an "annual percentage rate" is merely a rough decimal approximation of the "finance charge." The Truth in Lending Act requires the creditor to disclose this rough estimate in addition to the "finance charge," 12 C.F.R. § 226.18, in order to assist buyers in making fully informed decisions, *see* 15 U.S.C. § 1601(a); 12 C.F.R. § 226.1(b).

The contract, however, provides that in the event of a default, the "finance charge" will continue to accrue at the "annual percentage rate." When Chambers signed the contract, he agreed to a fixed late-payment penalty of 12 percent on the outstanding balance. This is the provision the District Court

6

relied upon when it found that Chambers had agreed to a late-payment penalty at the annual rate of 12 percent.

We hold that the District Court did not err when it concluded that the contract authorized a late-payment penalty in the amount of 12 percent of the outstanding balance.

## II

Did the District Court err when it found that Cessna's denomination of late-payment penalties as "finance charges" did not violate the Montana Retail Installment Sales Act?

Chambers cites § 31-1-235, MCA, in support of his argument that Cessna's denomination of late-payment penalties as "finance charges" violated the Montana Retail Installment Sales Act (MRISA). That statute provides that:

> The holder may collect a delinquency charge on each installment in default for a period of not less than 10 days in an amount not in excess of 5% of each installment or $5, whichever is less, <u>or in lieu thereof, interest after maturity on each such installment not exceeding the highest lawful contract rate</u>. [Emphasis added.]

Chambers contends that § 31-1-235, MCA, does not authorize lenders to denominate late-payment penalties as "finance charges" and that Cessna violated the MRISA by doing so.

Cessna, on the other hand, argues that Chambers is attempting to construe the MRISA too strictly and that substance should prevail over form. In support of this argument, Cessna cites *Bright v. Ball Memorial Hospital Association, Inc.* (7th Cir. 1980), 616 F.2d 328. The plaintiffs in that case were former patients who sued the hospital

7

for failure to make certain disclosures required by the Truth in Lending Act. In order to determine whether the Act applied, the Seventh Circuit had to decide whether charges denominated in the hospital's bills as "finance charges" were really finance charges or whether they were actually late-payment penalties. This distinction was critical, because the Act's definition of "finance charge" specifically excludes late-payment penalties. *Bright*, 616 F.2d at 336 (quoting 12 C.F.R. § 226.4(c)).

The plaintiffs in *Bright* argued that the hospital had assessed "finance charges" because it had expressly denominated its late-payment penalties as "finance charges" in its billing statements. Essentially they argued, just as Chambers argues in this case, that "finance charge" means "finance charge."

The Seventh Circuit held substance to prevail over form. Specifically, the court said:

> Finally, appellants argue that the Hospital's use of the label "finance charge" on its printed materials indicates that the charges are, in fact, "finance charges" under the Act. While we agree with appellants that this terminology is relevant to our determination, *see* FRB Unofficial Staff Interpretation No. 1172, *supra*, it is by no means determinative. *See* FRB Unofficial Staff Interpretation No. 414, *supra*. In this regard, we agree with the district court that "the substance of the billing system controls, not its labels." We conclude, therefore, that the monthly charges assessed against Bright's and Barber's accounts were bona fide "late payment" charges under Regulation Z, 12 C.F.R. § 226.4(c).

*Bright*, 616 F.2d at 338.

We agree with the Seventh Circuit's analysis of the problem. Chambers agreed to a late-payment penalty of 12 percent on the outstanding principal. His attempt to limit Cessna to the terminology contained in § 31-1-235, MCA, is an unduly restrictive attempt to exalt form over substance.

We hold that the District Court did not err in treating this late-payment structure as equivalent to a simple rate of interest.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

9

March 31, 1992

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Robert J. Emmons
Emmons & Sullivan
608 Strain Bldg.
Great Falls, MT 59401

G. Curtis Drake
Keller, Reynolds, Drake, Sternhagen & Johnson
38 S. Last Chance Gulch
Helena, MT 59601

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
    Deputy