**Norman KROLL et al., Plaintiffs,**

v.

**CITIES SERVICE OIL COMPANY,**
**Defendant.**

No. 69 C 2319.

United States District Court,
N. D. Illinois, E. D.

Dec. 13, 1972.

Goodhart, Kroll & Rubin, Lieberman, Levy, Baron & Stone, Chicago, Ill.; for plaintiffs.

Pope, Ballard, Shepard & Fowle, Chicago, Ill., for defendant.

## MEMORANDUM OF DECISION

TONE, District Judge.

Plaintiffs, retail credit card customers of defendant, Cities Service Oil Company, bring this action under the Truth in Lending Act, 15 U.S.C. § 1601 et seq. They propose to represent an alleged class of approximately 680,000 Cities Service credit card holders to whom monthly statements were mailed during the second half of 1969. Plaintiffs allege that defendant failed to disclose to the class during this period the credit information required to be furnished under the the Act.

Under defendant's credit card operation, a customer is billed on a monthly basis for purchases made during · the prior month. If the bill is not paid in full within 60 days of the initial billing date, the customer is assessed a monthly charge of 1½ per cent. This monthly charge is also imposed at the end of each subsequent month until the account is paid in full. Even though an account remains unpaid and the monthly charges continue to be assessed, the customer may continue to use his credit card for purchases. An account containing unpaid bills 180 days old is cancelled by defendant.

The Truth in Lending Act was signed on May 29, 1968, and became effective on July 1, 1969. Regulation Z, the body of regulations promulgated under the Act by the Federal Reserve Board, was published in final form in the Federal Register on February 11, 1969. 12 C.F.R. § 226.1, et seq. Counsel for defendant reviewed Regulation Z and determined that the Cities Service credit card plan probably was not covered by the Act. Shortly after that determination, on April 22, 1969, the Federal Reserve Board issued Interpretation 226.401 on the "open end" credit provisions of Regulation Z. This interpretation, which was published in the Federal Register on May 10, 1969, 12 C.F.R. § 226.401, seemed to indicate that the Cities Service plan was covered by the Act.

Defendant's management then considered the following alternatives, recognizing that it could not comply with the Act by its effective date, July 1, 1969: (1) stop imposing monthly charges on credit card customers until a final decision could be reached on the applicability of the Act to defendant's credit program, and, if necessary, its program could be brought into compliance; (2) take the position that their credit card operation was not subject to the Act and continue to impose monthly charges without changing their credit disclosure procedures; (3) impose the monthly charges while taking steps in the first few months of the Act's existence to bring their credit procedures into conformity with the Act, though not necessarily conceding its applicability to defendant. They decided upon the third alternative.

The Act authorizes consumers to whom creditors have not disclosed the required information to bring a civil action to recover twice the finance charge assessed to them, but not less than $100 nor more than $1,000 per transaction, plus costs and reasonable attorneys fees. 15 U.S.C. § 1640(a). This is such an action. Defendant succeeded in bringing its procedures in line with the requirements of the Act by January 1, 1970. The period at issue in this lawsuit is the six months from the effec-

tive date of the Act, July 1, 1969, to December 31, 1969. During these six months defendant collected approximately $252,000 in monthly charges.

The Truth in Lending Act requires creditors to disclose to consumers, in a uniform and meaningful manner, certain minimum information about their credit transactions so that they are able to compare more readily the various credit terms available to them. The Act does not regulate the amount of the credit charges or the terms of the credit transactions. It merely requires full and uniform disclosure of such charges and terms to help consumers shop for alternative sources of credit. Because uniformity of disclosure is an important purpose of the Act, its requirements are rather technical. Defendant admits that the forms it used in early 1969 for monthly statements to credit card customers did not contain the information required by the Act. Accordingly, when defendant decided to comply with the Act, it ordered new forms from its suppliers, drafted an initial disclosure statement which was included with every credit card statement mailed in July, August and September of 1969 and mass mailed separately in October, and, finally, drafted a supplement to the monthly statement which was mailed with every credit card statement mailed during each of the months of July through December of 1969. The new forms were put into use on January 1, 1970.

Regulation Z provides for a transition period of six months after the effective date of the Act for creditors to bring their credit procedures into compliance. Whether the steps taken by defendant in 1969 to comply with the Act were within this transition period provision, and thus whether the defendant complied with the Truth in Lending Act, is the major substantive issue in this case. Both parties have moved for summary judgment, raising additional issues which can be disposed of simply. Defendant has also filed a motion for an order disallowing the class action, which will be dealt with first.

*The Class Action*

■ Since Judge Frankel's opinion in Ratner v. Chemical Bank of New York Trust Co., 54 F.R.D. 412 (S.D.N.Y. 1972), all but one of the district courts which to our knowledge have considered the question in Truth in Lending cases have decided that the class action device is inappropriate.* There is no need here to decide that a class suit is never appropriate in such a case. The precise holding of *Ratner*, which is unquestionably sound, was that where the alleged violations of the Act are "at most technical and debatable," and where the size of the proposed class and the minimum $100 recovery portend "a horrendous, possibly annihilating punishment" to the defendant, "unrelated to any damage to the purported class or to any benefit to defendant," 54 F.R.D. at 416, the class action should not be confirmed.

In an effort to remove the possibility that defendant might be subjected to horrendous punishment by eventual recovery on behalf of the alleged class, plaintiffs have offered to voluntarily reduce their ad damnum to $504,000, an amount equal to twice the finance charges imposed by defendant during the six months it was allegedly not complying with the Act. Assuming for the moment that this offer were not fraught with legal difficulty (see Goldman v. First National Bank of Chicago, 56 F.R.D. 587 (N.D.Ill., 1972), it would not sufficiently distinguish this case from the *Ratner* rationale. Although the specter of "possibly annihilating" punishment to defendant would be largely removed, the violations al-

---

* See Judge McLaren's opinion in Garza v. Chicago Health Clubs, Inc., 56 F.R.D. 548 (N.D.Ill., 1972), and the cases cited at p. 549, n. 2 therein. But see Judge McMillen's recent opinion tentatively upholding the class action device in a Truth in Lending Act case and refusing to follow *Ratner*. Eovaldi v. First National Bank of Chicago, 57 F.R.D. 545 (N.D.Ill., 1972).

leged here and discussed below are still "highly technical" and even debatable, and the recovery would be unrelated to any damage to the purported class. Whether any of the members of the proposed class actually suffered damages from these alleged violations is highly speculative.

Accordingly, the motion for an order disallowing the class action will be granted.

*Summary Judgment*

In its motion for summary judgment, defendant contends that it is not subject to the Truth in Lending Act as a matter of law, that if applied to defendant's credit card program the Act and its regulations are so vague that they violate the due process clause of the Fifth Amendment, and finally, that defendant did in fact comply with the Act.

Section 121(a) of the Act, 15 U.S.C. § 1631(a), provides:

"Each *creditor* shall disclose clearly and conspicuously, in accordance with the regulations of the Board, to each person to whom *consumer credit* is extended and upon whom a *finance charge* is or may be imposed, the information required under this part." (Emphasis added.)

The terms "creditor" and "consumer credit" are defined by Section 103 (15 U.S.C. § 1602):

"(e) The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

"(f) The term 'creditor' refers only to creditors who regularly extend or arrange for the extension of, credit for which the payment of a *finance charge* is required, whether in connection with loans, sales of property or services, or otherwise. . . . (Emphasis added.)

. . . . . .

"(h) The adjective 'consumer', used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, household, or agricultural purposes."

The term "finance charge" is defined in Section 106 (15 U.S.C. § 1605):

"(a) Except as otherwise provided in this section [none of the exceptions is applicable here], the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit, including any of the following types of charges which are applicable:

"(1) Interest, time price differential, and any amount payable under a point, discount, or other system of additional charges.

"(2) Service or carrying charge."

It is clear that plaintiffs' transactions with defendant were consumer credit transactions. Defendant granted plaintiffs the right to defer payment of plaintiffs' debt and the named plaintiffs are all natural persons who purchased services from defendant for personal, family and household purposes.

Whether defendant is a "creditor" for the purposes of the Act depends upon whether the monthly charge imposed on bills not paid in full within 60 days constitutes a "finance charge" under the Act. At first blush, the language of the statute quoted above defining "finance charge" seems broad and all-encompassing. But Section 226.4(c) of Regulation Z, 12 C.F.R. § 226.4(c), grafted the following rather ambiguous exception on the statutory language:

"A late payment, delinquency, default, reinstatement, or other such charge is not a finance charge if imposed for actual unanticipated late payment, delinquency, default or other such occurrence."

This is apparently the language upon which counsel for defendant based their initial determination in the spring of 1969 that its credit card program was not covered by the Act. They took the position, and defendant contends in this case, that its monthly charge is an "actual unanticipated late payment," not a "finance charge."

To clear up the ambiguity in the language of Regulation Z, the Federal Reserve Board issued its Interpretation 226.401 (12 C.F.R. § 226.401) on April 22, 1969:

"(a) Some vendors bill their customers for property or services purchased under the terms of a credit plan which requires that the full amount of each billing be paid within a stipulated period after billing, with no privilege of paying in installments. If the bill is not paid within that stipulated period of time, the vendor imposes a service charge periodically on the unpaid balance until the account is paid in full. The question arises as to whether Regulation Z applies to such transactions.

"(b) When in the ordinary course of business a vendor's billings are not paid in full within that stipulated period of time, and under such circumstances the vendor does not, in fact, regard such accounts in default, but continues or will continue to extend credit and imposes charges periodically for delaying payment of such accounts from time to time until paid, the charge so imposed comes within the definitions of a 'finance charge' [§ 226.2(q)] applicable in each case to the amount of the unpaid balance of the account. Under such circumstances the credit so extended comes within the definition of 'open end credit' in § 226.2(r), the vendor is a creditor as defined in § 226.2(m), and the disclosures required for open end credit accounts under § 226.7 shall be made."

This Interpretation seems to be specifically directed to credit card programs like the one in this case. Defendant does not extend the privilege of paying in installments. It does not regard accounts in which payments are late as accounts in default, but continues to extend credit until the charges remain unpaid for 180 days. Its monthly charges are specifically included by the Interpretation in the definition of "finance charge" in the Act.

■■■ Defendant argues that its monthly charges are nevertheless by their very nature "actual unanticipated late payment charges" rather than "finance charges," and that Interpretation 226.401 should be disregarded by the court as invalid and inconsistent with Regulation Z. These arguments are unconvincing. In an effort to show that defendant does or does not "anticipate" the imposition of late payment charges upon its customers, the parties vigorously dispute the precise percentage of Cities Service credit card holders who do not pay their bill in full within 60 days, placing the percentage at 6 per cent, 13 per cent, 23 per cent and 50 per cent in different places in their briefs. But, as Judge Latchum observed in his discussion of Interpretation 226.401 in Continental Oil Co. v. Burns, 317 F.Supp. 194, 198, n. 3 (D.Del.1970),

"Since the word 'unanticipated' means 'not foreseen or expected', it would appear that an 'actual unanticipated late payment' charge would be the antithesis of a charge stemming from a course of conduct where credit is continued even though payments are repeatedly late and late payment charges are periodically imposed."

In short, Interpretation 226.401 is not inconsistent with Regulation Z; it "merely represents an attempt to clarify or define what is meant and what is not meant by the term 'actual unanticipated late payment' charge." 317 F.Supp. at 198. Because defendant's monthly charges are imposed periodically where credit is continued and payments are repeatedly late, those charges seem to be actually "anticipated," even if they are

imposed on only a small percentage of defendant's customers. They certainly cannot be said to compel by their very nature the conclusion that they fall within the exception of Regulation Z. While an interpretive rule is not binding upon the courts, it is usually held valid "unless it is plainly erroneous or inconsistent with the regulation," Bowles v. Seminole Rock Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945), Continental Oil Co. v. Burns, *supra*, 317 F.Supp. 194, 200 (D.Del.1970). Interpretation 226.401 is therefore valid as a clarification of Regulation Z, defendant's monthly charge constitutes a "finance charge" as defined therein, and defendant is a "creditor" under the Truth in Lending Act and therefore subject to the Act's disclosure requirements.

■ Since Interpretation 226.401 so clearly describes defendant's credit card program, all that remains of its contention that the Act as applied to it is unconstitutionally vague is the assertion that because Interpretation 226.401 was issued only two months before the effective date of the Act, defendant had no real chance to comply with its provisions. In view of the liberal transition period provision written into Regulation Z by the Federal Reserve Board, however, this argument is without merit. The defendant had plenty of time to comply with the Act, had it decided to move with dispatch to bring its procedures into line when it first became aware on April 22, 1969, that it was subject to the Act's disclosure requirements. Whether defendant indeed moved to take the necessary steps with the requisite dispatch is the only issue remaining in the case.

Regulation Z has the following transition period provision:

"Any creditor who can demonstrate that he has taken bona fide steps, prior to July 1, 1969, to obtain printed forms which are necessary to comply with the requirements of this part may, until such forms are received but in no event later than December 31, 1969, utilize existing supplies of printed forms for the purpose of complying with the disclosure requirements of this part, other than the requirements of paragraph (b) of Section 226.9: *Provided*, that such forms are altered or supplemented as necessary to assure that all the items of information the creditor is required to disclose to the customer are set forth clearly and conspicuously." 12 C.F.R. § 226.6(k).

Defendant contends that it fully complied with this provision by mailing a supplementary document along with its monthly statements in the last half of 1969. The plaintiffs argue to the contrary for three separate reasons. First, they contend that defendant failed to comply with the "Provided" clause in the transition period provision, because it did not disclose all of the information required by the Act. Second, they contend that because the numerical amounts and percentages in the supplementary document were not printed in 10 point type, they were not "set forth clearly and conspicuously." Third, plaintiffs argue that defendant did not take bona fide steps to obtain new forms until after July 1, 1969.

■ The precise pieces of information which plaintiffs argue were not disclosed are "the dollar amount of the balance on which the finance charge was computed" and the fact that "a minimum balance of $10 or more remaining unpaid for 60 days or more was necessary before a finance charge would be assessed." As defendant points out, however, 15 U.S.C. § 1637(b)(8) and 12 C.F.R. § 226.7(b)(8), the sections which plaintiffs contend require this information to be disclosed, provide only that "[t]he balance on which the finance charge was computed, and a statement of how that balance was determined" must be disclosed. While at first blush the fact that a minimum balance of $10 and unpaid payments of 60 days or more is required before a finance charge will be assessed seems to be part of "a statement of how that balance was determined," on further reflection it appears

instead to be part of "the conditions under which a finance charge may be imposed," which are required to be disclosed only initially, before the credit account is opened. 15 U.S.C. § 1637(a)(1), 12 C.F.R. § 226.7(a)(1). In its supplementary document, Cities Service explained that "[t]he amount of the FINANCE CHARGE, . . . was computed by the application of a single monthly periodic rate of 1½% to the 'Previous Balance' shown after deducting the 'Payments Rec'd'." The "Previous Balance" and the "Payments Received" were shown on the monthly statement in the old form accompanying the supplementary document. This was an adequate statement of "how the balance was computed," which is the precise requirement of the Act. Furthermore, when read with the monthly statement, this supplement sufficiently disclosed "the balance upon which the finance charge was computed." By subtracting the "Payments Rec'd" from the "Previous Balance" on the monthly statement, the customer could arrive at the dollar amount of the balance upon which the finance charge was imposed. To read the Act to require that the dollar amount of the balance be shown specifically during the transition period would virtually nullify the transition period provision in the Regulation. Such a reading would have made it impossible to use a supplementary document. It would have required defendant to use new forms and computer programs immediately so that the dollar amount of the balance could be shown in each case. Such an interpretation is obviously inconsistent with the purpose of the transition period provision.

■ Plaintiffs also contend that the statement in defendant's monthly statement form that payment was "due upon receipt" was misleading and untrue in view of the fact that no finance charge was imposed until the expiration of 60 days. This is merely a semantic dispute. The fact that payment is due upon receipt of a statement does not necessarily mean that a failure to pay will immediately subject the customer to a finance charge. It merely means that the company is advancing a claim to payment and that it expects the customer to pay in a short period of time. In any event, the supplementary document makes clear that defendant was not threatening to impose finance charges if payment was not immediately forthcoming. It states that "the Current Charges shown" on the monthly statement must be "paid prior to the expiration of 55 days from [the closing date of this statement] to avoid additional FINANCE CHARGES." Defendant's statement that payment was "due upon receipt" cannot therefore be said to be misleading or untrue.

■ Defendant printed the numbers and percentages in the supplementary document in 8 point type. In arguing that defendant was required to print all numerical amounts and percentages in the supplementary document in not less than the equivalent of 10 point type, plaintiffs attempt to read into the transition period provision the general disclosure requirements of Regulation Z, 12 C.F.R. § 226.6(a). However, defendant's interpretation of the transition period provision as an exception to the general rule is more persuasive. That provision merely requires that the information disclosed in the supplementary documents be "set forth clearly and conspicuously." Since the use of these documents was designed to be merely temporary, and since Congress undoubtedly foresaw that they might be drafted and printed in haste, reading the transition period provision merely to require that the numerals to be set forth clearly and conspicuously rather than in any particular size type comports better with its purpose. Moreover, the general disclosure rule of 12 C.F.R. § 226.6(a) requires that all numerical amounts and percentages be printed "clearly" and "conspicuously" *and* "in not less than the equivalent of 10 point type." The drafters of the transition period provision adopted only the first part of that language. Where we can discern pur-

pose in Congress's deliberate choice of language, we should give it effect. A glance at the supplementary document shows that the numbers are set forth in a clear and conspicuous manner. That is all that the transition period provision requires.

In light of the above discussion, it is clear that if the transition period provision is applicable to defendant, all the items of information defendant was required to disclose were indeed disclosed and set forth clearly and conspicuously, and defendant therefore fully complied with the Act. The only question remaining as to the provision's applicability here is whether defendant "can demonstrate that [it had] taken bona fide steps, prior to July 1, 1969, to obtain printed forms which are necessary to comply with the requirements . . . ." Plaintiffs contend that after Interpretation 226.401 was issued, putting defendant on notice that it was subject to the Act, defendant spent its remaining time until the Act went into effect on July 1, 1969, debating its alternatives. Plaintiffs claim that defendant took no bona fide steps to obtain new forms and fully comply with the Act until after July 1, and therefore should not be allowed the refuge of the transition period provision. There appears to be no dispute between the parties over the meaning of the language of that provision. It plainly requires bona fide steps to be taken before July 1, 1969. Defendant's contention is that it did make efforts to obtain the new forms and to effect new computer procedures before July 1, and it has submitted affidavits which support that contention. Plaintiffs rely on an internal memorandum prepared by one of defendant's officers after July 1, 1969, which, although ambiguous in its language, may support plaintiffs' allegation that defendant did not finally decide to comply with the Act and obtain new forms until after July 1, 1969, and that the inquiries it made about the costs and benefits of obtaining new forms and instituting new procedures prior to that date were only tenta-tive and preliminary inquiries. There is, therefore, a genuine issue as to a material fact, and summary judgment cannot be granted. The trial of the case will be limited to the issue of whether the defendant took bona fide steps to obtain new forms before July 1, 1969.

The defendant's motion for an order disallowing the class action is granted, and the cross-motions for summary judgment are denied. These orders render moot plaintiffs' motion to require the defendant to produce certain allegedly confidential documents, since the documents relate to issues no longer in the case. The motion is therefore denied. The trial is set for January 29, 1973. The final pretrial conference, at which time a form of final pretrial order will be presented by the parties, is set for January 15, 1973 at 9:00 A.M.