Simon J. IBERLIN; Michael L.
Standish; and Paul G. Jarvis,
Appellants (Plaintiffs),

v.

TCI CABLEVISION OF WYOMING,
INC., a Wyoming corporation,
Appellee (Defendant).

No. 92–118.

Supreme Court of Wyoming.

June 25, 1993.

Dennis M. Kirven, Kirven & Kirven, P.C., Buffalo, Kim D. Cannon and Kate M. Fox, Burgess, Davis & Cannon, Sheridan and Cheynne, for appellants.

John R. Perry, Goddard, Perry & Vogel, Buffalo, Robert E. Youle and Amy L. Benson, Williams, Youle & Koenigs, P.C., Denver, CO, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

THOMAS, Justice.

The controversy in this case is whether the billing practices and collection procedures of TCI Cablevision of Wyoming, Inc. (TCI) constitute the extension of credit and involve the imposition of a credit service charge within the provisions of WYO. STAT. §§ 40–14–101 to –702 (1977 & Supp.1992), the Wyoming Uniform Consumer Credit Code (WUCCC). The trial court entered summary judgment in favor of TCI, ruling that the billing practices of TCI did not constitute an extension of credit and that the $3 or $2 late fee charged to a subscriber when the bill for services due on the first of the month was not paid by the nineteenth day of the month did not constitute a credit service charge. In short, the district court held the billing system and collection practices adopted by TCI did not come within the WUCCC. A collateral issue was raised with respect to equitable estoppel incorporating the contention that, by advising the administrator of the WUCCC it did extend credit, TCI was foreclosed from asserting its billing practices and collection procedures did not come within the WUCCC. The district court ruled that the doctrine of equitable estoppel did not pertain with respect to TCI. We are in complete accord with the rulings of the district court. The summary judgment entered by the trial court is affirmed.

The appellants, individual subscribers to services from TCI (subscribers), set forth the issues in their brief in this way:

A. Does TCI's consumer billing system subject it to the Wyoming Uniform Consumer Credit Code?

1. Does TCI extend credit to it customers?

2. Is TCI's late fee a credit service charge or finance charge?

B. Is TCI estopped from changing its position that its consumer billing system is subject to the Wyoming Uniform Consumer Credit Code?

TCI articulates the issues in this way:

1. Whether the District Court correctly found that TCI Cablevision of Wyoming, Inc.'s ("TCI of Wyoming") late payment charge is not subject to the provisions of the Wyoming Uniform Consumer Credit Code ("WCCC")?

A. Whether the District Court correctly found that TCI of Wyoming does not extend credit to its subscribers where TCI of Wyoming bills in advance of service and takes prompt steps to terminate service once a subscriber's payments are delinquent?

B. Whether the District Court correctly found that TCI of Wyoming's late payment charge is not a finance change under the WCCC but instead a default charge for actual unanticipated late payment?

C. Whether the District Court correctly found that the WCCC should not be expanded by the Court to include transactions by "unregulated public utilities" regardless of the nature of the transaction?

II. Whether the District Court correctly found that TCI of Wyoming is not quasi estopped from denying that it engages in consumer credit transactions under the WCCC?

TCI provides cable television services to a number of communities in Wyoming, including Cheyenne, Laramie, Gillette, Buffalo, Newcastle, Wright, Moorcroft, Upton, Lander, Riverton, Cody, Thermopolis, Powell, Greybull, Worland, and Basin. In July of 1988, TCI acquired the system that serves Buffalo, where the subscribers who brought this action reside. TCI bills its subscribers in advance for the services it furnishes. The business methods used by TCI result in subscribers receiving a bill on about the twenty-second day of each month for the services to be furnished the following month. This means the subscribers are billed about one week prior to the first date of service for which the charge is assessed. Each bill to a subscriber states it is due "on receipt." If that bill has not been paid by the next billing date, about the nineteenth day of each month, TCI considers the account to be delinquent and assesses a $2 late charge on all balances exceeding $9.99.[1] The subscriber is informed at the time the late charge is assessed, and that service will be disconnected unless the bill is paid in full. TCI does not permit its subscribers to pay their accounts in installments.

If payment has not been received by the forty-fifth day after the first day of the service period, TCI places the subscriber on its disconnect list, and a work order is issued pursuant to which a TCI employee is directed to go to the subscriber's house and disconnect the service. When the employee makes that visit, an attempt is made to collect the unpaid balance of the account but, if payment is not received, the cable service is disconnected. If payment is not made, the disconnection will ordinarily be accomplished between forty-five and sixty days after the first date on which payment for the service was due. At that time, a final bill is prepared and sent to the subscriber and, if payment is not received within forty-five days after service is dis-

---

**1.** Prior to the acquisition of the Buffalo system by TCI, a $3 late payment charge was assessed. In February of 1990, subsequent to the acquisition of that system by TCI, TCI reduced the late payment charge to $2 to bring it in line with the charge assessed in its other systems. Although the TCI bills state that the subscriber will be

considered delinquent after the sixteenth day of the service month if payment has not been remitted, the billing cycle does not close until the nineteenth day of the month. Any payment received between the sixteenth and nineteenth day of any month is not considered late.

connected, the account is turned over to a collection agency.

This action was instituted by subscribers to the Buffalo cable television system operated by TCI. Each of these subscribers uses the cable service for personal household purposes. According to the allegations and materials provided in connection with the summary judgment proceedings, each of the subscribers has been assessed a late payment charge by TCI and has paid it. None of them has ever had the cable services disconnected.

The action was filed as a class action suit by the subscribers on April 30, 1990. The complaint alleged that TCI extended credit to the subscribers and violated the provisions of the WUCCC when it failed to disclose the terms of the extension of credit as required by the statute. The subscribers allege the late payment charge was a credit service charge or a delinquency charge also subject to the WUCCC, and it exceeded the maximum allowable under the statute. Liquidated damages were sought pursuant to the complaint of not less than $100 for each transaction of every member of the class, together with a penalty in an amount ten times the alleged excess charges. TCI, in its answer, asserted that the late payment charges it assessed were not subject to the provisions of the WUCCC. The parties agreed to a stay of the determination of the subscribers' motion for class certification pending the ruling by the trial court as to whether the late payment charge assessed by TCI was subject to the WUCCC.

The parties then filed cross-motions for summary judgment, and the district court entered a summary judgment in favor of TCI. In its ruling, the district court held that TCI does not extend credit to its subscribers when it bills them in advance for services and then takes steps to promptly terminate service when an account becomes delinquent. The district court further ruled that the TCI late payment charge is not a finance charge subject to the WUCCC because the charge does not depend upon the time the bill remains unpaid and is imposed for actual unanticipated late payments. The court rejected the arguments submitted by the subscribers that the provisions of the WUCCC should be extended to cover all unregulated public utilities and that TCI was estopped from denying it engages in consumer credit transactions because of filings made with the administrator of the WUCCC indicating it did extend credit. The appeal is taken from the order granting summary judgment to TCI.

■ The fundamental purpose of a summary judgment is to eliminate the expense and burden of trial when only questions of law are involved. *Coones v. F.D.I.C.*, 848 P.2d 783 (Wyo.1993); *Elmore v. Van Horn*, 844 P.2d 1078 (Wyo.1992) (citing *Powder River Oil Co. v. Powder River Petroleum Corp.*, 830 P.2d 403 (Wyo.1992)); *Stauffer Chem. Co. v. Curry*, 778 P.2d 1083 (Wyo.1989); *Fiscus v. Atlantic Richfield Co.*, 773 P.2d 158 (Wyo.1989); *Johnson v. Soulis*, 542 P.2d 867 (Wyo. 1975). A summary judgment is appropriate when the only issue is the resolution of a question of law based upon a settled set of facts. *Guggenmos v. Tom Searl–Frank McCue, Inc.*, 481 P.2d 48 (Wyo.1971). When we review a summary judgment, we assume the same posture as the trial court. The same materials are before us, and we follow the same standards. The party seeking the summary judgment must carry the burden of establishing the absence of any genuine issue of material fact and also demonstrating that judgment is appropriate as a matter of law. We examine the record from the vantage point most favorable to the party opposing the motion, affording to that party every favorable inference that may be drawn from the facts. *See, e.g., Arrow Constr. Co., Inc. v. Camp*, 827 P.2d 378 (Wyo.1992); *Jones v. Chevron U.S.A., Inc.*, 718 P.2d 890 (Wyo.1986); *Noonan v. Texaco, Inc.*, 713 P.2d 160 (Wyo.1986).

In this context, we discover that summary judgment routinely has been entered by other courts when the issue presented is whether a late payment charge is subject to the provisions of the Uniform Consumer Credit Code (1968 Act adopted by Wyoming in 1971) (UCCC) and the federal Truth in

Lending Act, 15 U.S.C. §§ 1601, *et seq.* (TILA), which are substantially the same as the WUCCC. *See, e.g., Vega v. First Fed. Sav. & Loan Ass'n of Detroit,* 622 F.2d 918 (6th Cir.1980); *Bright v. Ball Memorial Hosp. Ass'n, Inc.,* 616 F.2d 328 (7th Cir. 1980); *Garland v. Mobil Oil Corp.,* 340 F.Supp. 1095 (N.D.Ill.1972); *Staples v. Jenkins Builders, Inc.,* 447 So.2d 779 (Ala.Civ. App.1984); *Rogers Mortuary, Inc. v. White,* 92 N.M. 691, 594 P.2d 351 (1979). *See also Stevens v. Rock Springs Nat'l Bank,* 577 P.2d 1374 (Wyo.1978) (affirming trial court's summary judgment on cause of action for violation of WUCCC).

The issue primarily debated by the parties in this instance is whether the provisions of the WUCCC reach a late payment charge under the circumstances of this case. We emphasize that here the subscribers of the cable television service are billed in advance for services furnished the following month. The contention of the subscribers is that TCI must be held to extend credit within the meaning of the WUCCC because it permits its subscribers to defer payment of their accounts if they pay the $2 late charge. The subscribers characterize this as a credit service charge or, in the alternative, a fee that is not limited to the reasonable administrative costs of carrying delinquent accounts. The subscribers also urge the proposition that this late charge does not fall within the actual unanticipated late payment exception to the WUCCC. TCI's contention is that an agreement to pay before the completion of services does not result in an extension of credit under the WUCCC, and that the charge imposed is a default charge, not a credit service charge, and it is thus excluded from the reach of the WUCCC. The trial court accepted and adopted the contentions of TCI, and we agree that its resolution is correct.

The version of the UCCC adopted in Wyoming was enacted in 1971 with an express purpose "[t]o protect consumer buyers * * * against unfair practices by some suppliers of consumer credit, having due regard for the interests of legitimate and scrupulous creditors." WYO. STAT. § 40–

14–102(b)(iv) (emphasis added). The WUCCC conforms to the regulation contained in the federal Consumer Credit Protection Act, 15 U.S.C. §§ 1601, *et seq.,* which includes the federal TILA as Title I, and the statute applies to all creditors engaged in "consumer credit sales."

A consumer credit sale is defined as:

Except as provided in subsection (b) of this section, "consumer credit sale" is a sale of goods, services or an interest in land in which:

(i) Credit is granted by a person who regularly engages as a seller in credit transactions of the same kind;

(ii) The buyer is a person other than an organization;

(iii) The goods, services, or interest in land are purchased primarily for a personal, family, or household purpose;

(iv) Either the debt is payable in installments or a credit service charge is made; and

(v) With respect to a sale of goods or services, the amount financed does not exceed twenty-five thousand dollars ($25,000.00).

WYO. STAT. § 40–14–204(a) (Supp.1992). In this instance, the debate focuses on subsections (i) and (iv) of the statute. The first question is whether TCI extends credit and, if that question is answered in the affirmative, the next question is whether a "credit service charge" is assessed. No claim is made by the subscribers that the debt is permitted to be paid in installments pursuant to subsection (iv).

The statute defines the word "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." WYO. STAT. § 40–14–140(a)(vii). The district court in this case ruled that, in requiring payment before services were furnished, and in taking steps to discontinue service once the account was found delinquent, TCI did not extend credit under the WUCCC. The case is argued as one of first impression in Wyoming, but a number of courts have construed substantially similar provisions of Truth in Lending Regulations, Regulation Z, 12 C.F.R. §§ 226.1 to –226.30 (1993)

[hereinafter Reg. Z] and have held that these transactions, which require payment in full, even where payment is required only after completion of services, do not come within TILA. *See, e.g., Staples,* 447 So.2d 779; *Sealey v. Boulevard Constr. Co.,* 70 Ohio App.2d 277, 437 N.E.2d 305 (1980).

Some particular cases are worthy of comment. In *Ault v. Gen. Property Management Co.,* 683 P.2d 988 (Okla.Ct.App.1984), a case relied on by the district court, an attorney agreed to represent a client for $1,200. The appellate court reversed the ruling of the trial court that the Oklahoma Consumer Credit Code had been violated by an arrangement pursuant to which the client gave the attorney a note secured by a second mortgage on his house, which required the client to make monthly payments. The reversal was premised upon the proposition that, even though this was an extension of credit, there was no evidence the attorney did so regularly. While the subscribers in this case urge that *Ault* is distinguishable on the ground that TCI "regularly" extends credit, they overlook the view of the Oklahoma court that an agreement to pay upon the completion of services did not result in an extension of credit under the Oklahoma statute. That rule leads to the conclusion that TCI does not extend credit because it requires payment prior to the furnishing of services.

In *Rogers Mortuary,* 594 P.2d 351, the mortuary had agreed with a customer that it would be paid in full upon completion of services. It assessed a late payment charge if an account had not been paid after thirty days from the completion of services. When the mortuary sued to collect its account, the customer urged that the agreement was in violation of the TILA provision which is substantially similar to WYO. STAT. § 40–14–204(a). A ruling in favor of the mortuary was affirmed because the court held that a creditor's requirement for an account to be paid in full upon completion of services does not constitute an extension of credit within the meaning of the statute.

A similar situation involving an ambulance company was presented to the Eleventh Circuit Court of Appeals in *Hahn v. Hank's Ambulance Serv., Inc.,* 787 F.2d 543, *reh'g denied,* 792 F.2d 1126 (11th Cir. 1986). The ambulance company required payment in full upon the completion of services. If payment was not made in cash or by check immediately after services were completed, a $5 late payment charge was assessed. Addressing a claim that the late payment charge violated TILA, the Eleventh Circuit Court of Appeals held that the ambulance company did not allow the defendant to defer payment of a debt or to incur debt and defer its payment. The court ruled it simply assessed a late fee in light of the customer's delinquency, and the transaction did not encompass any extension of credit.

■ TCI business methods differ from those in the foregoing cases because it requires payment in full before the completion of services. If, as we are satisfied is true, the rule of law is that a transaction pursuant to which payment is required upon the completion of services is not an extension of credit within the meaning of statutes like the WUCCC, a transaction that requires payment before services are furnished cannot result in an extension of credit. If the delay in making payment is permitted until the completion of the services furnished, the creditor is certainly affording a benefit to the debtor for which the debtor is delaying, even temporarily, full payment. We agree with the other courts that such an arrangement is not an extension of credit so long as payment is required upon completion of the services and, under that analysis, no extension of credit occurs when the creditor requires payment in full before any services are furnished. That is the arrangement with TCI.

The subscribers contend TCI would have permitted them to defer payment of their accounts if they had paid the late payment charge. The record does not support that contention. TCI bills state clearly that they are due "on receipt." There is nothing to indicate a subscriber could avoid

disconnection of his service if he merely paid the late payment charge. To avoid disconnection, he must pay the account in full and, if not, the service is discontinued.

The thrust of the foregoing cases, including particularly *Hahn, Staples,* and *Rogers,* is that the mere fact a customer does not pay on time does not bring the transaction within the statutory provisions that are substantially identical to the WUCCC. The courts consistently have held agreements requiring payment upon completion of services do not involve an extension of credit even if the customer does not pay on time. If delinquency would suffice to bring a transaction within the statute, every transaction in which a delinquency fee was imposed would be subject to the code, compelling creditors of all varieties to meet the filing requirements of the WUCCC contrary to the general purpose of the statute. *See* UNIF. CONSUMER CREDIT CODE (1968 Act) U.L.A. § 2.104 cmt. 1 (1985). The imposition of a late charge by TCI does not make the transaction one in which credit is extended under the WUCCC.

■ There are tandem requirements in the statute, and the subscribers in this instance also have to demonstrate the imposition of a credit service charge or that TCI allows payment of the accounts in installments in order for the transaction to come within the WUCCC. WYO. STAT. § 40–14–204(a)(iv). There is no issue here with respect to permission by TCI to subscribers to pay their accounts in installments. Our inquiry with respect to this subsection of the statute must focus on whether TCI imposes a credit service charge. The WUCCC specifically states that a credit service charge does not include charges assessed as a result of default or delinquency charges. WYO. STAT. § 40–14–

209(b). The WUCCC requires the administrator of the WUCCC to promulgate rules and regulations "in harmony with" those regulations adopted by the Board of Governors of the Federal Reserve System under the Consumer Credit Protection Act. WYO. STAT. § 40–14–604(c). The administrator of the WUCCC[2] has issued a regulation excluding "[c]harges for actual unanticipated late payment, * * * or for delinquency, default, or a similar occurrence" from the definition of a "finance charge."[3] Rules and Regulations of the Administrator, WUCCC, § 2.4(c)(ii) (1991). This regulation is essentially identical to Reg. Z § 226.-4(c)(2), which was adopted by the Board of Governors of the Federal Reserve System to implement TILA.

Although the parties, in their briefs, primarily debate whether the TCI late payment charge is for an actual unanticipated late payment, the TCI late payment charge specifically is excluded from the operation of the WUCCC by WYO. STAT. § 40–14–209(b), which provides for a charge assessed upon default. Default is defined as the failure to pay principal or interest on a debt when payment is due. The $2 late payment charge is imposed only upon default, and its purpose, like the definition of all true late payment charges, is to deter default. Clearly, the late payment fee that TCI assesses is not a credit service charge under WYO. STAT. § 40–14–209(b).

■ In addition, the $2 charge is excluded from the operation of the WUCCC because it is an actual unanticipated late charge as discussed in the Rules and Regulations of the Administrator, WUCCC § 2.4(c)(ii). There is no Wyoming precedent addressing this issue, but we are aided by the Federal Reserve Board's Official Staff Interpretation[4] relating to Reg. Z

---

2. The WUCCC now designates the state banking commissioner as its administrator. WYO.STAT. § 40–14–603 (Supp.1992). The administrator is required to adopt rules and regulations implementing the WUCCC. WYO.STAT. § 40–14–604(b) (Supp.1992). The regulations were adopted prior to state government reorganization when the state examiner was the designated administrator.

3. "Finance charge," under the Rules and Regulations of the Administrator, includes "credit service charges." Rules and Regulations of the Administrator, WUCCC § 2.2(a)(xxvi) (1991).

4. The Official Staff Interpretations are the vehicle by which the staff of the Division of Consumer and Community Affairs of the Federal Reserve Board issues official staff interpretations of Reg. Z, as revised effective April 1, 1981. They are held valid unless plainly errone-

§ 226.4(c)(2). The Official Staff Interpretation makes it clear that included within the exception for actual unanticipated late payments are late payment charges imposed for failure to pay an account in full when due and also provides that a late payment charge may not be a credit service charge even if service is continued after default. The Official Staff Interpretation lists two factors to be considered in making this determination:

- The terms of the account. For example, is the consumer required by the account terms to pay the account balance in full each month? If not, the charge may be a finance charge.
- The practices of the creditor in handling the accounts. For example, regardless of the terms of the account, does the creditor allow consumers to pay the accounts over a period of time without demanding payment in full or taking other action to collect? If no effort is made to collect the full amount due, the charge may be a finance charge.

12 C.F.R. § 226.4(c) (1993) Truth in Lending Regulations, Regulation Z (Supp. I to Part 226 Official Staff Interpretations ¶ 4(c)(2) 305).

If this case were being decided by the application of the factors found in the Official Staff Interpretations, TCI's late payment charge would fit within the actual unanticipated late payment exception. TCI does require that its subscribers pay its bill in full when the bill is received. If payment is not received by the billing date for the month during which services are furnished, the late payment charge is assessed and the subscriber is warned that disconnection will follow. TCI does not permit its subscribers to pay their accounts over a period of time without demanding payment in full or taking other action to collect. The defaulting subscriber is notified that his account is delinquent and that his service will be disconnected if his payment has not been received by the next billing period. The subscriber cannot avoid disconnection by simply paying the late payment charge; the entire account must be brought current. Even after disconnection, TCI tries to collect the payment owed. If its collection efforts are unsuccessful, the account is turned over to an agency for collection. The application of the Official Staff Interpretation factors demonstrates that TCI's charge is clearly within the exception relating to actual unanticipated late payments.

This conclusion is made more positive by reference to advice furnished by the Federal Reserve Board to those who sought its counsel. Prior to the issuance of the Official Staff Interpretation to Reg. Z, the Federal Reserve Board issued informal interpretive letters advising companies about the implications of their proposed credit methods. Even though the Official Staff Interpretation has replaced this practice, those letters remain persuasive authority. *See, e.g., Bright,* 616 F.2d 328; *Lipson v. Burlington Sav. Bank,* 428 F.Supp. 1073 (D.Vt.1977). In issuing such letters, the Federal Reserve Board consistently found credit practices that are substantially more liberal than TCI's did not constitute an extension of credit under TILA.

In a letter of April 4, 1977, the Federal Reserve Board furnished advice to a provider of home fuel oil. The Federal Reserve Board advised that the provider need not immediately terminate the service of intermittently delinquent customers in order to avoid having its late payment charge classified as a credit service charge under TILA. Federal Reserve Board Official Staff Interpretation FC–0060 (April 4, 1977) 42 Fed.Reg. 25489 (1977). The letter noted that, if a company continued to impose late charges on a delinquent account without taking affirmative steps to collect the account, which would include eventual termination, the late payment charges then would be viewed as credit service charges. TCI does not assess late fees upon late fees, and it does take immediate steps to collect past-due accounts.

ous or inconsistent with the regulations they interpret. *Porter v. Hill,* 314 Or. 86, 838 P.2d 45 (1992). *See also Bowles v. Seminole Rock &* *Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *Continental Oil Co. v. Burns,* 317 F.Supp. 194 (D.Del.1970).

In an earlier letter, dated May 16, 1974, the Federal Reserve Board offered advice to a bank, which was contemplating the imposition of a late payment charge on delinquent users of an open credit account. The Federal Reserve Board advised that the classification of this charge as a late payment charge or a credit service charge depended on actions taken by the creditor. Federal Reserve Board Letter (May 16, 1974) No. 797 by Jerauld C. Kluckman, Chief, Truth in Lending Section, CCH CONSUMER CREDIT GUIDE ¶ 31,119 (1974), *reprinted in* TRUTH-IN-LENDING SPECIAL RELEASES—CORRESPONDENCE APRIL 1969 TO OCTOBER 1978. The letter stated, "If a creditor imposes a late payment charge periodically and yet continues to allow the delinquent customer to use his credit plan without informing him that his account is in default and that continued delinquency" will result in termination of credit, such conduct could make the late payment charge subject to classification as a credit service charge and subject to TILA. However, the letter stated that, if "procedures to follow-up and exert pressure on those who have not made payment by the due date" are implemented and, if the account is terminated within a reasonable period of time, the late payment charge would not be classified as a credit service charge. The suggestion of the Federal Reserve Board was that sixty days would be a reasonable period of time within which to terminate an account.

TCI does notify subscribers when they are in default and warns them that disconnection will soon follow. Moreover, it terminates service within the sixty-day period that the Federal Reserve Board suggested was reasonable. Subsequently, the Federal Reserve Board has approved plans that continue credit substantially longer than sixty days. In a letter dated May 23, 1978, the Federal Reserve Board advised a credit card provider that its proposed late payment charge would not constitute a credit service charge under TILA even though it continued to extend credit to some customers, depending upon the history of the customer with their company, up to 105 days after delinquency. Federal Reserve Board Letter (May 23, 1978) No. 1301, by Robert Plows, Section Chief, CCH CONSUMER CREDIT GUIDE ¶ 31,792 (1978). In this letter, the Federal Reserve Board emphasized two critical factors to be invoked in its analysis. The first was whether the customer's failure to pay on time was not anticipated in any particular case; and the second was whether the creditor treats the account as delinquent and whether it takes commercially reasonable steps to correct the situation. The late payment charge was not deemed a credit service charge because the creditor informed its customers of delinquency for all accounts thirty days past due with a balance above $10; continued notification on fifteen to thirty-day intervals; and eventually terminated credit.

We can discern from these situations that a late payment charge is not a credit service charge so long as it does not take on the character of interest, which the term "credit service charge" implicates. If the creditor continually and cumulatively assesses late payment charges against delinquent accounts, without even notice to the debtor that the account is considered delinquent, the late payment charge ceases to insure prompt payment and starts to generate revenue from the underlying debt. In such a context, the "late payment charge" serves as a "credit service charge" or interest. It suggests that the payment of the debt can be deferred so long as the "charge" is paid. Furthermore, even if it is the policy of the creditor to declare accounts delinquent after they are past due, the creditor must not acquiesce in the delinquency. Whatever its written policy may provide, the creditor must not lead the debtor to believe that payment of the late fee, without paying the full account, will suffice to defer payment of the account in full. The creditor must, in fact, use the late payment charge, as its term implies, to assure prompt payment, and it must follow up with reasonable commercial efforts to collect the debt. It cannot let its late payment charge serve like a "credit service charge."

TCI follows the proper procedure, utilizing the late payment fee to insure prompt

payment and pursuing strict procedures to collect debts that are past due. This conclusion is supported by the holdings of most other courts that have addressed the issue of a late payment charge similar to that of TCI. In *Bright*, 616 F.2d 328, relied upon by the district court, the United States Court of Appeals for the Seventh Circuit held that a late payment charge was not a credit service charge where the hospital notified the customer that his account was delinquent and took reasonable commercial efforts to collect his past-due account. Similarly, the court in *Garland*, 340 F.Supp. 1095, held that Mobil Oil's late payment charge imposed on delinquent credit card users was not a credit service charge because Mobil terminated accounts more than ninety days delinquent and requested return of the card. *See also Hahn*, 787 F.2d 543; *Vega*, 622 F.2d 918; *Eriksen v. Fisher*, 166 Mich.App. 439, 421 N.W.2d 193 (1988); *Rogers Mortuary*, 594 P.2d 351.

*Kroll v. Cities Serv. Oil Co.*, 352 F.Supp. 357 (N.D.Ill.1972), relied upon by the subscribers in arguing that TCI's late payment charge is really a credit service charge, demonstrates what occurs if, under the guise of imposing a late payment charge, the creditor imposes a credit service charge. The facts in *Kroll* are in sharp contrast to those presented in this case. A charge of one and one-half percent was imposed on balances that remained unpaid for sixty days, and the same charge was imposed at the end of every subsequent month that the balance remained unpaid, up to six months. It is clear that the imposition of the charge if payments were late was anticipated, and it had the complete character of a credit service charge or interest. It was measured by a fixed percentage rate of the unpaid balance; it was imposed each month a debt remained unpaid up to six months; and it permitted the debtor to defer payment as long as the charge was paid. The district court agreed with *Kroll*, holding that, "[b]ecause defendant's monthly charges are imposed periodically where credit is continued and payments are repeatedly late, those charges seem to be actually 'anticipated' * * *."

*Kroll*, 352 F.Supp. at 362. See also *Landon v. Mapco, Inc.*, 405 N.W.2d 825 (Iowa 1987).

In this case, the subscribers argue, however, that the district court erred in holding that TCI's late payment charges fall within the actual unanticipated late payment exception. They contend, first, that TCI budgets for the late payment charge revenue and, second, TCI has not shown that the late payment fee is limited to the reasonable administrative costs of carrying a delinquent account. We perceive a misunderstanding of the law by the subscribers in asserting these propositions. Adoption of a rule that a late payment charge *ipso facto* becomes a credit service charge every time the creditor budgets revenue from such charges would cause the term "late payment charge" to lose all its meaning. By adopting a practice of imposing a late payment charge, TCI, or a creditor in general, anticipates that there will be delinquent accounts in the course of its business, and it does perforce anticipate revenue therefrom. This general anticipation that there will be delinquencies does not, however, convert the late payment charge, designed to insure prompt payment of past-due accounts and to deter delinquency in the future, into a credit service charge. TCI, or a creditor similarly situated, has no anticipation that any particular subscriber or customer in any given case will be delinquent. The creditor does not assess charges on a particular debtor for the purpose of generating a regular stream of revenue from that debtor like it could expect to derive from a "credit service charge." Instead, the late payment charge is provided for in general anticipation that there will be some delinquent accounts.

■ For example, in *Bright* the claim was urged that, because the defendant hospital generated $78,000 in revenue from the imposition of its late payment charge, and since it budgeted for this revenue, the late payment charge was not "unanticipated." The Seventh Circuit Court of Appeals rejected the plaintiff's argument saying:

The fact that a business may expect to have delinquent accounts and anticipate

the possible receipt of some revenues from the charges imposed on such accounts does not automatically render such charges "finance charges." Rather, "unanticipated" within [Reg. Z] means that the failure of any customer to pay his bill on time is not anticipated in any particular case.

*Bright,* 616 F.2d at 337.

The district court in this case properly relied on *Bright.* We agree with the Seventh Circuit Court of Appeals, and hold that, since there is no evidence that TCI anticipates that a particular subscriber will not pay his bill when due and, therefore, assesses a credit service charge in the guise of a late payment charge, TCI's late payment charge comes within the exception in the WUCCC for an actual unanticipated late payment.

The subscribers urge this court to not follow *Bright.* Pointing out that the holding from a case in another jurisdiction is not mandatory precedent, the subscribers rely upon *Stevens v. Rock Springs Nat'l Bank,* 577 P.2d 1374 (Wyo.1978). In that case we said that neither the provisions of TILA, nor its regulations, were incorporated by reference into the WUCCC. On the surface, these statements are correct, but the argument presented by the subscribers is the very one we cautioned against in *Stevens.* There we were requested to read into the WUCCC a provision that was contained in TILA, but not WUCCC. We explained in *Stevens* that provisions not included in the WUCCC could not be incorporated into it by this court even if the provision was in the statute on which the WUCCC was modeled. When the legislature chooses to adopt most of the provisions of a statute from another jurisdiction, but excises certain portions, it cannot be said to have intended to give effect to the provisions it did not incorporate.

■ Viewed from this perspective, *Stevens* is inapposite. Reg. Z, which was construed in *Bright,* is virtually identical to Rules and Regulation of the Administrator, WUCCC § 2.4(c)(ii), and that is the focus of our inquiry. We have stated that, when the legislature adopts a statute from another jurisdiction, case law in that jurisdiction construing the statute is persuasive authority. *Apodaca v. State,* 627 P.2d 1023 (Wyo.1981). Where, as in this instance, the words of the statute are materially the same and where the reasoning of the other court interpreting the statute is sound, we do not sacrifice sovereign independence, nor undermine the unique character of Wyoming law, by relying upon the precedent of a foreign jurisdiction.

Subscribers' effort to distinguish *Bright* because the revenue generated from late payment charges in *Bright* was "small" is equally ineffective. The Seventh Circuit Court of Appeals did not rely in any way on the amount of revenue in making its determination that the late payment charge fit within the actual unanticipated late payment exception. There is nothing in *Bright* to indicate that the court afforded any significance to the amount of the late payment charge.

■ The subscribers next argue that late payment charges should be limited to the reasonable administrative cost of carrying delinquent accounts. The thrust of this argument is that, if the late payment charge exceeds reasonable administrative costs of carrying a delinquent account, it must be perceived as a credit service charge. The failure to raise this issue before the district court means this court will not consider it for the first time on appeal. *Forney v. Minard,* 849 P.2d 724, 731 (Wyo. 1993) (citing *Kemper Architects v. McFall, Konkel,* 843 P.2d 1178 (Wyo.1992)); *Squaw Mountain Cattle Co. v. Bowen,* 804 P.2d 1292 (Wyo.1991); *Thatcher & Sons, Inc. v. Norwest Bank of Casper, N.A.,* 750 P.2d 1324 (Wyo.1988).

Consequently, although we can avoid this question, we point out that we would be constrained to reject it on the merits. WYO. STAT. § 40–14–209 excludes charges imposed because of default from the reach of the WUCCC, and there is nothing to indicate that the legislature intended to limit default charges to reasonable administrative costs. The legislature easily could have incorporated such a standard in the statute, and it did not. We have no justifi-

cation for importing the artificial restriction into the statute in the absence of the legislature doing so.

The subscribers do cite one case to support their proposition, *Williams v. Bill Watson Ford, Inc.*, 423 F.Supp. 345 (E.D.La.1976). The issue in that case, however, was whether a notary fee charged by the creditor should have been included in its finance charge calculation. Pursuant to Reg. Z, charges "actually paid" to public officials are excluded from the calculation of the finance charge but, to come within the inclusion, the entire charge must have been paid to the public official. Reg. Z § 226.4(b), (c)(7)(iii). The point presented to the court in *Williams* was that the creditor's disclosure statement was inadequate because the notary fee charged exceeded the amount actually paid to the public official. That is an entirely different question than the one in this instance, which is whether a finance charge is assessed at all. We are satisfied that *Williams* is inapposite. In any event, we cannot conceive that any limitation of late payment charges to the reasonable administrative costs of carrying delinquent accounts would serve to overturn a $2 late payment charge. Such a charge could not possibly cover the costs of clerical staff, postage, technical supervisory time to schedule the disconnection, and the actual cost of a TCI technician going to the home of subscribers, endeavoring to collect the debt, and then disconnecting the service. The argument that the $2 charge exceeds actual reasonable administrative costs of performing all these tasks is impossible.[5]

■ The subscribers make one further argument to preserve their claim. They contend that, even if the WUCCC does not extend in express terms to these transactions, as a matter of public policy, the court should extend the WUCCC coverage to all non-regulated public utilities. The subscribers rely upon the legislature's admoni-

tion that the statute "shall be liberally construed and applied to promote its underlying purposes and policies." WYO.STAT. § 40–14–102(a). The subscribers contend that, because the legislature in WYO.STAT. § 40–14–121(a)(iii) expressly excluded from the reach of the statute late payment charges assessed by regulated public utilities, the legislature must have intended to include all late payment charges by unregulated public utilities. We perceive this reasoning to be faulty and, if it were adopted, it would effect a radical and unintended change in the statute.

The WUCCC, by its express terms, applies to certain transactions as defined in WYO.STAT. § 40–14–204(a). The legislature chose to exclude certain transactions even if they came within the express terms of the statute. The exemption for charges by regulated public utilities is one of those excluded transactions. WYO.STAT. § 40–14–121(a)(iii). The subscribers' argument that this exemption demonstrates an intention that would justify including all charges assessed by non-regulated public utilities would only be justified if we accepted the notion that the legislature meant to define coverage by exemptions. It is clear that this is not what the legislature intended. We refuse to legislate in such a way as to make the statute read to justify this claim.

■ The final contention of the subscribers presents their reliance upon quasi-estoppel. They urge that TCI is estopped from denying that it extends credit because of filings it made with the administrator of the WUCCC from 1987 to 1990. In each of those years, TCI erroneously reported to the administrator that it extended credit within the meaning of the code. The subscribers contend that TCI would benefit in an unconscionable way if it were not estopped from denying that it extends credit. TCI responds that the subscribers' argument fails since they did not plead it. TCI

---

5. We also note that the evidence developed below suggests that, instead of deriving net income from the imposition of late payment charges, the actual cost of performing disconnection related tasks exceeds revenue derived from the charges. For example, for the period ending August 31, 1990, TCI assessed (but did not necessarily collect) $102,136.33 in late payment revenue. In the same period, TCI incurred $124,382.39 in bad debt and collection costs.

also urges the proposition that its reliance on erroneous legal advice in filing the Creditor Notification Returns does not justify the application of quasi-estoppel.

■ The subscribers' argument is barred because they failed to plead it in their complaint. WYO.R.CIV.P. 8 requires that claims of estoppel be pleaded, and the subscribers did not state an estoppel claim in their complaint, nor did they ask leave of court to amend their complaint. We do not consider such an issue on its merits unless it has been pleaded. *Fuss v. Franks,* 610 P.2d 17 (Wyo.1980); *Title Guar. Co. of Wyoming v. Midland Mortgage Co.,* 451 P.2d 798 (Wyo.1969); *Sturgeon v. Brooks,* 73 Wyo. 436, 281 P.2d 675 (1955).

Even if we were to address this assertion on the merits, we would have to reject it. The doctrine of quasi-estoppel " 'was developed to prevent a party from retaining a benefit by asserting a position to the disadvantage of another and then asserting a right which is inconsistent with that previous position.' " *Neiman–Marcus Group, Inc. v. Dworkin,* 919 F.2d 368, 371 (5th Cir.1990). We identified the elements necessary for the application of this doctrine in *National Crude, Inc. v. Ruhl,* 600 P.2d 716, 720 (Wyo.1979) (citation omitted), as follows:

(1) whether the party against whom estoppel is sought has gained from a change in position; (2) whether the change in position is unconscionable; and (3) whether the first position was based upon the same information.

In examining those elements in the context of this case, we are satisfied that TCI has not gained anything by its change of position. It simply has had its rights adjudicated and has been returned to the position it would have held if it had not erroneously claimed to have extended credit. We said in *Cline v. Safeco Ins. Cos.,* 614 P.2d 1335,

1338 (Wyo.1980) (quoting *Matter of Frederick's Estate,* 599 P.2d 550, 556 (Wyo. 1979)):

Unconscionability is * * * considered as a form of fraud recognized in equity, but such fraud should be "apparent from the intrinsic matter and subject of the bargain itself; such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other * * *."

There is nothing in this instance to demonstrate unconscionability. The subscribers admit that they were not even aware of the filings that TCI had made with the administrator of the WUCCC. Furthermore, the third element of the doctrine of quasi-estoppel is not established. The inconsistent positions that are asserted were not based on the same information. In making the filings, TCI relied upon erroneous advice of counsel, and it would not have made those filings had it had correct advice.

In summary, we hold that TCI does not extend credit in connection with its business operations, and the late payment charge assessed is not imposed for the extension of credit under the WUCCC. It simply is a charge assessed upon default which is excluded by the code. The WUCCC does not apply to all non-regulated public utilities. The doctrine of quasi-estoppel does not serve to assist the subscribers in this case in any way.

The judgment of the district court granting TCI summary judgment is affirmed.